1   WALTER F. BROWN, JR. (SBN 130248)
    MELINDA HAAG (SBN 132612)
2   PAMELA R. DAVIS (SBN 172870)
    LUCY E. BUFORD (SBN 244885)
3   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
4   405 Howard Street
    San Francisco, CA  94105-2669
5   Telephone:    415-773-5700
    Facsimile:    415-773-5759
6

7   Attorneys for Defendant
    WILLIAM HOLMAN
8
                    IN THE UNITED STATES DISTRICT COURT
9
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
                        SAN FRANCISCO DIVISION
11

12
    UNITED STATES OF AMERICA,              CASE NO.  CR-05-0208 CRB
13
                    Plaintiff,             **DEFENDANT WILLIAM HOLMAN'S**
14                                         **SENTENCING MEMORANDUM**
            v.                             **AND MOTION TO DEPART**
15
    VIDEO NETWORK COMMUNICATIONS
16  INC., *et al.*,

17                  Defendants.

18

19

20

21

22

23

24

25

26

27

28

OHS West:260352130.3

1

## TABLE OF CONTENTS

2
**Page**

3   I.      INTRODUCTION ................................................................................1

4   II.     BACKGROUND ...................................................................................1

        A.      BILL'S PERSONAL BACKGROUND ...............................................1

5       B.      THE OFFENSE ..................................................................................3

6   III.    ARGUMENT .........................................................................................6

7       A.      ADVISORY GUIDELINES................................................................6

            1.      Bill Played a Minimal Role in the Offense................................7

8           2.      The Presentence Report Erroneously Applied a Two-Level Increase

9                   Under U.S.S.G. § 3B1.1 ...........................................................11

            3.      Grounds for Downward Departure From Advisory Guidelines
10                  Range .....................................................................................14

11                      a.      Bill Has Extraordinary Family Responsibilities...........14

                        b.      Bill's Behavior Was Aberrant....................................16

12                      c.      Bill's Plea Encouraged Others to Plead........................17

13                      d.      The Court Should Depart Below the Applicable Guidelines
                                Range Purusant to U.S.S.G. § 5K1.1, Based Upon
14                              Substantial Assistance ...............................................17

                        e.      A Combination of the Factors Above Justify the Requested
15                              Departure .................................................................18

16      B.      ADDITIONAL FACTORS UNDER SECTION 3553(A) SUPPORT A
                SENTENCE OF PROBATION .............................................................19

17          1.      The Nature and Circumstances of the Offense Support the
                    Requested Sentence .................................................................20
18
            2.      The History and Characteristics of the Defendant Support the
19                  Requested Sentence .................................................................21

20                      a.      Bill Plays a Vital Role in the Lives of His Two Teenage
                                Children ...................................................................21

21                      b.      Bill Has No Criminal History and Will Not Engage in
                                Future Criminal Conduct............................................23
22
            3.      The Public Will Benefit From the Requested Sentence ............24
23      C.      FINE....................................................................................................24

    IV.     CONCLUSION ....................................................................................25
24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Gall v. United States,* 128 S.Ct. 586 (2007) ................................................................... passim

*Kimbrough v. United States,*
   128 S.Ct. 558 (2007) ....................................................................................................... 6

*United States v. Aguirre,*
   214 F.3d 1122 (9th Cir. 2000) ..................................................................................... 15

*United States v. Aptt,*
   354 F.3d 1269 (10th Cir. 2004) ................................................................................... 12

*United States v. Booker*, 543 U.S. 220 (2005) ................................................... 1, 6, 23

*United States v. Cabrera,*
   328 F.3d 506 (9th Cir. 2003) ....................................................................................... 13

*United States v. Cook,*
   938 F.2d 149 (9th Cir. 1991) ....................................................................................... 19

*United States v. Crouse,*
   145 F.3d 786 (6th Cir. 1998) ......................................................................................... 7

*United States v. DeGiovanni,*
   104 F.3d 43 (3d Cir. 1997) .................................................................................... 13, 14

*United States v. Dethlefs,*
   123 F.3d 39 (1st Cir. 1997) .......................................................................................... 17

*United States v. Dominguez,*
   296 F.3d 192 (3d Cir. 2002) .................................................................................. 15, 16

*United States v. Garcia,*
   926 F.2d 125 (2d Cir. 1991) ........................................................................................ 17

*United States v. Gonzalez,*
   58 F.3d 459 (9th Cir. 1995) ......................................................................................... 18

*United States v. Lam,*
   20 F.3d 999 (9th Cir. 1994) ......................................................................................... 19

*United States v. Lewis,*
   476 F.3d 369 (5th Cir. 2007) ....................................................................................... 13

*United States v. Luciana,*
   379 F. Supp. 2d 288 (E.D.N.Y. 2005) ....................................................................... 23

*United States v. Matney,*
   375 F. Supp. 2d 482 (W.D. Va. 2005) ....................................................................... 13

*United States v. Menyweather,*
   447 F.3d 625 (9th Cir. 2006) ....................................................................................... 14

*United States v. Milikowsky,*
   65 F.3d 4 (2d Cir. 1995) .............................................................................................. 15

*United States v. Panaro,*
   266 F.3d 939 (9th Cir. 2001) ....................................................................................... 12

*United States v. Ravelo,*

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page(s)**

3

370 F.3d 266 (2d Cir. 2004) ...........................................................................7

4

*United States v. Rose,*
20 F.3d 367 (9th Cir. 1994) ..........................................................................13

5

*United States v. Scholz,*
907 F. Supp. 329 (D. Nev. 1995) ............................................................12, 13

6

7

*United States v. Smith,*
119 F.3d 8 (9th Cir. 1997) ............................................................................13

8

*United States v. Ward,*
814 F. Supp. 23 (E.D. Va. 1993)...................................................................23

9

*United States v. Working,*
224 F.3d 1093 (9th Cir. 2000) ......................................................................16

10

*United States v. Zavala,*
443 F.3d 1165 (9th Cir. 2006) ...................................................................6, 19

11

## STATUTES

12

§   6

13

15 U.S.C. § 1..................................................................................................1

14

18 U.S.C. § 3553 (a) ................................................................................passim

18 U.S.C. § 3553 (a) (2) ................................................................................19

15

18 U.S.C. § 3553 (a) (3-4) .............................................................................19

16

18 U.S.C. § 3553 (a)(5) .................................................................................19

18 U.S.C. § 3553 (a)(6) .................................................................................19

17

18 U.S.C. § 3553 (a)(7) .................................................................................19

18

18 U.S.C. §3553(a) .......................................................................................16

19

U.S.S.G. § 3B1.2...........................................................................................7

## OTHER AUTHORITIES

20

§ 5K1.1 ...................................................................................................17, 18

21

§3B1.1(c) ......................................................................................................12

22

U.S.S.G. § 2R1.1 (a) ......................................................................................6

U.S.S.G. § 3B1.1.....................................................................................11, 12

23

U.S.S.G. § 3B1.2 (a) ......................................................................................6

24

U.S.S.G. § 3E1.1 ...........................................................................................7

25

U.S.S.G. § 5E1.2(d) ................................................................................24, 25

U.S.S.G. § 5F1.3 ..........................................................................................24

26

U.S.S.G. § 5K2.0 ..........................................................................................18

27

U.S.S.G. § 5K2.20 ........................................................................................16

28

U.S.S.G. §3B1.1.....................................................................................12, 13, 14

- iii -

1

## TABLE OF AUTHORITIES
### (continued)

Page(s)

U.S.S.G. §3B1.1(c) ............................................................................................................ 11

# I.   INTRODUCTION

Bill Holman is, and has been throughout his life, an exemplary person, guided by the principles of devotion to his family and commitment to his professional career.  During the year 2000, however, Mr. Holman failed to properly exercise his professional judgment and report to the authorities the involvement of his employer, NEC-Business Network Solutions ("NEC"), in the inappropriate and illegal actions of Judy Green and her associates.  Bill now comes before this Court for sentencing after pleading guilty to one count of bid rigging in violation of 15 U.S.C. § 1. By this motion and memorandum, Mr. Holman asks this Court to sentence him to probation based upon the holistic consideration of unique circumstances of this case, as required by *United States v. Booker* and *Gall v. United States*.  Most notably, a sentence of probation will allow Mr. Holman to continue to serve as the sole parent to and provide for the needs of his two children, following the death of his wife and their mother.

# II.   BACKGROUND

## A.   BILL'S PERSONAL BACKGROUND

Bill Holman is, first and foremost, a man devoted to his family.  He is a strong and loving father to his three children Joshua, age 26, Erin, age 16, and Daniel, age 13.  He was a committed husband and caregiver during his wife Rhonda's long struggle with cancer, culminating in her rapid decline and death during the months of November 1999 through February 2000.

Rhonda was first diagnosed with breast cancer in 1994 when Erin was just 3 years old and Daniel was still a newborn.  Over the next five years, the family's life revolved around Rhonda's illness and treatments, her remissions and recurrences.  After a period of remission, doctors found a tumor on Rhonda's spine the week before Thanksgiving in 1999.  She entered the hospital, underwent a traumatic surgery which left her paralyzed but for the use of one arm, and ultimately succumbed to the cancer and died in February 2000.  During those final months, Bill was the source of strength and courage for his family.  He alternated between sleeping in his wife's hospital room and staying with young Erin and Daniel at home in Grand Junction, Colorado.  After Rhonda's death, Bill became the single father of the couple's two young children.

Many of the character letters submitted to the Court express respect and admiration for

1  Bill's courage through Rhonda's horrific illness and death and his strength and skill as a father to

2  Erin and Daniel.  *See e.g.*, Letter from Robert W. Wise, Declaration of Lucy E. Buford ("Buford

3  Decl."), ¶ 2, Ex. A ("Throughout the five years of Rhonda's intense battle with breast cancer, and

4  continuing since her death, Bill has fully and energetically assumed sole responsibility for his

5  children."); Letter from John D. Sanders, Buford Decl., ¶ 3, Ex. B ("To his credit as a single parent

6  Bill has remained steadfastly responsible in his duties as a Father and is raising two very fine and

7  well adjusted teenagers.").  Erin and Daniel are teenagers who have no memory of their mother as

8  healthy but have clear memories of her illness and death.  They rely on their father much more

9  strongly than average teenagers, as he has, in many ways, been their only parent.  Bill has been

10  fortunate to recently marry a woman, Shannon, who stands by his side and encourages his

11  relationship with his children.

12      Bill is also a man committed to hard work and forging his own success in the business

13  world.  This dedication and drive enabled Bill to emerge from a modest working-class background,

14  put himself through college and build a successful career as a respected businessman.  Bill's

15  success in business extends beyond simple facts and figures.  Those who have worked with Bill

16  have been impressed by his dedication, professionalism and integrity.  *See e.g.*, Letter from Reed

17  Killets, Buford Decl., ¶ 4, Ex. C ("[Bill] was always willing to teach others and show them the

18  right way to do things at his own expense at times and never looked for credit for anything that was

19  accomplished.  He practiced good judgment and was respected by employees at all levels of the

20  organization."); Letter from John D. Sanders, Buford Decl., ¶ 3, Ex. B ("Bill's genuine concern to

21  maintain high standards in the sales effort with prospective customers has been an inspiration to

22  me and many others to achieve a higher level of success in our business of major system

23  technology sales."); Letter from Ed Cantwell, Buford Decl., ¶ 5, Ex. D ("Professionally, Bill is the

24  most capable sales leader in the business.  His track record over the last five years is most

25  impressive despite the tough economy and competition.  He is highly respected by his team,

26  customers and investors.")

27      Currently, Bill bears leadership responsibility for the sales team of Inner Wireless, a

28  Richardson, Texas-based company.  That the executives at Inner Wireless feels such confidence in

OHS West:260352130.3

- 2 -

Bill, in the face of this investigation, indictment and guilty plea, is a strong testament to his integrity and leadership.  *See e.g.*, Letter from Ed Cantwell, Buford Decl., ¶ 5, Ex. D ("I have supported Bill through this entire process as have my Board of Directors, who are the top venture capitalists in the U.S.").

B.     **THE OFFENSE**

The Presentence Report provides a significantly detailed background of the larger E-Rate fraud at issue in this case.  The facts particular to Bill are far more limited due to his limited role in the conduct.

In 1999, Bill was Vice-President of National Accounts at NEC.  In late-1999, precisely during the time that Bill's wife Rhonda suffered the severe and final recurrence of her cancer and returned to the hospital, Judy Green approached an NEC employee, Sohail Qasim, with the suggestion that NEC work with her company, Video Network Communications, Inc. ("VNCI"), in a concerted effort to become E-Rate vendors and win contracts at E-Rate funded schools.[1]  Qasim passed the suggestion along to his supervisors, including Susan Leonard, Mark Jamison, John Colvin (Northern California Manager of Sales), and their supervisor Rod Rafnson, Vice-President and General Manager of the Western Region. The agreement was generally viewed as a potentially profitable endeavor.

Though Bill was not the supervisor of this group at that time, the employees asked for his input on the teaming agreement and contract because of questions as to where, within NEC's corporate structure, the E-Rate project would fit.[2]  The employees told Bill that VNCI was a smaller company with a specialized technological niche and therefore needed to work with a larger, broader-based company.  Bill was told that Green and VNCI had partnered, with great success, with such companies as Lucent Technologies and Inter-Tel, Inc. and that Green encouraged the contractors with whom she worked to make donations of equipment to the schools. Bill was assured that Green was not acting as a consultant to the schools during the bid process.

---

[1]  Green knew Qasim because she had worked with him in VNCI's similar partnership with his former employer, Inter-tel, Inc.

[2]  At this time, the E-Rate program did not come under Bill's supervision.  He was promoted to Senior Vice-President of Sales in mid-2000.

1   Bill did not view VNCI as a competitor to NEC.

2          Bill's primary concern, in addressing the parameters of the NEC / VNCI relationship, was

3   that NEC be able to make its required profit margin through the relationship. He understood that

4   the value offered by VNCI was Green's expertise with the E-Rate program – expertise which had

5   worked to the benefit of two other large and well-respected technology companies. He

6   determined, applying standard corporate bidding policy and practices that the cost of any in-kind

7   donations of end user equipment to the schools would be incorporated into NEC's bid.

8          Bill had no knowledge that NEC and VNCI employees had agreed that VNCI would refrain

9   from bidding against NEC on certain E-Rate projects or that any party intended to act in an anti-

10  competitive manner. The teaming agreement did not express, explicitly or implicitly, any such

11  agreement or intention. The teaming agreement on its face, is a basic subcontracting agreement,

12  making any payment to VNCI contingent on NEC's success in obtaining a contract with a school

13  district. Nowhere in the agreement is any requirement that as part of the relationship, VNCI could

14  not bid on its own for E-Rate projects. Bill signed the agreement based upon his prior experience

15  with similar agreements and under the reasonable belief that the agreement was legally appropriate

16  in all respects.

17         After the agreement was signed, the NEC employees, namely Colvin and Gerard McNulty,

18  began the task of selecting schools and preparing for the bids. Colvin and McNulty reported to,

19  and took direct from their supervisor Rod Rafnson, and not Mr. Holman. At the time of these bid

20  preparations and submissions, in December 1999 and January 2000, Bill turned almost all of his

21  attention to his dying wife and his children. Without Bill's knowledge or approval, Colvin and

22  McNulty independently orally agreed with Green to bid in an anti-competitive manner. Though

23  Bill was aware that Colvin and McNulty were preparing bids for Ceria Travis and other schools, he

24  did not know at the time that those bids would be non-competitive. Bill was generally uninvolved

25  and unaware of the parameters of NEC's bids, including the Ceria Travis project, and certainly did

26  not instruct Colvin and McNulty to prepare non-competitive bids. Indeed, the Probation Officer

27  notes that "[a]lthough Holman signed a written agreement related to payments for VNCI, he was

28  unaware that the NEC-BNS employees reached an oral agreement with Judy Green and VNCI to

1   behave in a non-competitive manner." (Presentence Report at ¶ 17).

2           As noted in the Presentence Report, Bill had minimal contact with Judy Green. (*See*

3   Presentence Report at  ¶ 19.)  He met her on a single occasion, during a passing hallway encounter.

4   Certainly, he did not know that Green would be acting in any other capacity than as a vendor,

5   much less that she would effectively be marketing herself as an E-Rate expert consultant to the

6   school districts while simultaneously acting as a vendor.  He did not know that Green had

7   promised the schools, including Ceria Travis, that they would not have to pay their 10% co-pay.

8   Neither Colvin nor McNulty informed Bill, during this initial time period, that Green was in fact

9   controlling the bidding process and shutting out other vendors.  In fact, when communications

10  from Colvin and McNulty seemed to suggest that Green was running the bidding process at one of

11  the schools, Bill immediately questioned whether she was acting appropriately.  His employees

12  assured him that Green was not crossing the line of propriety, much less legality.

13          In February 2000, Bill's wife died just after the bids had been submitted and winning

14  bidders selected.  After her death, Bill and his children remained in Grand Junction, Colorado until

15  the end of the children's school year and then moved to Dallas.  Bill slowly returned to his full

16  responsibilities at NEC.  With his promotion to Senior Vice-President of Sales, he became more

17  involved with the E-Rate projects, although Colvin was promoted to Director of Public Sector

18  Sales, with direct oversight over the E-Rate program as his sole responsibility .  As Bill became

19  more involved, he began to see, and to question, the nature of Green's relationship with the school

20  districts.  Bill became increasingly concerned with propriety of Green's actions and NEC's

21  relationship with Green and VNCI.  Bill raised these concerns both with his superiors at NEC and

22  with Green's superiors at VNCI.  He demanded that VNCI reign in Green.  When VNCI failed to

23  respond to Bill's concerns, he pushed for NEC to withdraw from the agreement and prevented any

24  more contracts from being entered into.  However, Bill allowed the already consummated contracts

25  to continue, including the Ceria Travis project.  He failed to report any of his concerns or Green's

26  actions to the government.  As the Plea Agreement and the government's Sentencing Memorandum

27  make clear, Bill's liability arises from this failure to take further appropriate steps. ("Since his

28  principal liability is based on his failure to notify those authorities and not on his participation in

OHS West:260352130.3                              - 5 -

1  any impermissible activities, a departure . . . is respectfully requested").  (Government's Sentencing

2  Memorandum at 5).

3                                **III.  ARGUMENT**

4          The Court must fashion an appropriate sentence by considering all of the factors set forth in

5  18 U.S.C. § 3553 (a).  *See United States v. Booker*, 543 U.S. 220 (2005).  The recent Supreme

6  Court decisions in *Gall v. United States*, 128 S.Ct. 586 (2007) and *Kimbrough v. United States*,

7  128 S.Ct. 558 (2007) further illustrate that, post-*Booker*, the Guidelines are truly advisory and that,

8  in fact, the sentencing court may not presume that the advised Guidelines sentence is reasonable.

9  The duty of the sentencing court is to "make an individualized assessment based on the facts

10  presented" and to articulate that assessment in handing down a sentence.  *Gall*, 128 S.Ct. at 597.

11  *See also United States v. Zavala*, 443 F.3d 1165, 1170 (9th Cir. 2006) (With "a mind open to all of

12  the nuances and possibilities of the human condition," the Court must "find the most reasonable

13  sentence within the territory of all possible reasonable sentences.")  The central command of §

14  3553 (a), that the Court impose a sentence that is "sufficient, but not greater than necessary," to

15  comply with the purposes of sentencing, including retribution, deterrence incapacitation, and

16  rehabilitation, thus becomes the paramount guide to the sentencing court.  18 U.S.C. § 3553 (a).

17          In accordance with our understanding of the Court's practice, we address first the applicable

18  advisory Guidelines range, then the appropriate grounds for departure from the advisory

19  Guidelines, and finally, the relevant factors under 18 U.S.C. § 3553 (a).  As discussed below,

20  *whether framed as grounds for downward departure or as statutory factors*, there are ample

21  grounds to grant Bill the requested reasonable sentence of probation.

22  **A.      ADVISORY GUIDELINES**

23          We respectfully submit that the advisory guidelines range as calculated in the Presentence

24  Report is incorrect.  Under U.S.S.G. § 2R1.1 (a), the applicable base offense level is 10, which is

25  increased by 1 point because the offense involved bid rigging and by 5 points for the volume of

26  commerce to which the parties have stipulated.  The offense level should then be adjusted

27  downward four points for Bill's minimal role in the offense pursuant to U.S.S.G. § 3B1.2 (a) and

28

OHS West:260352130.3                              - 6 -

1    an additional two points for his acceptance of responsibility under U.S.S.G. § 3E1.1.[3]  The

2    resulting total offense level is 10.[4]

3                    1.       **Bill Played a Minimal Role in the Offense.**

4            The Guidelines provide for a two, three, or four-level reduction when the defendant played

5    a minor or minimal role in the offense.  U.S.S.G. § 3B1.2.  In determining the applicable

6    adjustment under this provision, the Court must consider the facts of the particular case and weigh

7    the totality of the circumstances.  *Id.* at app. note 3(C).  A four-level adjustment applies to

8    defendants, such as Bill, "who are plainly among the least culpable" of those involved.  *Id.* at app.

9    note 4.  A defendant's lack of knowledge of the scope of the enterprise and of the others' activities

10   indicates he is a minimal participant.  *Id.*  A two-level reduction requires only that the defendant

11   "is less culpable than most other participants."  *Id.* at app. note 5.  A three-level adjustment is

12   granted for defendants whose participation was between minimal and minor.  U.S.S.G. § 3B1.2.

13           In determining whether a defendant is entitled to a mitigating role adjustment, the Court

14   considers such factors as:  (1) the nature of the defendant's relationship to other participants; (2) the

15   importance of the defendant's actions to the success of the venture; and (3) the defendant's

16   awareness of the nature and scope of the criminal enterprise.  *United States v. Ravelo*, 370 F.3d

17   266, 269-70 (2d Cir. 2004) (citation and internal quotation marks omitted).  A defendant's

18   supervisory or leadership position with an organization such as NEC does not make him ineligible

19   for a mitigating role adjustment.  *C.f. United States v. Crouse*, 145 F.3d 786, 791 (6th Cir. 1998)

20   (vacated and remanded on other grounds) ("[T]he district court believed that Crouse, even though

21   he was the CEO of the company, had played a relatively minor role in the fraud because he was not

22   involved in day-to-day decision-making and should therefore receive a more lenient sentence.").

23           Here, the Court should grant a four-level reduction for mitigating role because Mr. Holman

24   is "plainly among the least culpable" of all other charged defendants, and the uncharged NEC

25   _____

[3] Consistent with the plea agreement, the Probation Officer recommends a 3 level downward adjustment under 3E1.1,

26   based upon Mr. Holman's early acceptance of responsibility.  Three points are only available, however, if the total
     offense level is 16 or greater.  Because the offense level should be reduced for Mr. Holman's role in the offense, the

27   resulting offense level of 12 would only qualify him for a 2 level reduction.
     [4] In its motion for downward departure, the government has recommended that Mr. Holman receive a two level

28   departure, based upon his substantial assistance.  An offense level of 8 would result in a sentencing range of 0-6
     months.

1  employees, involved in the criminal activity.

2       First, the nature of Bill's relationship to the other participants in the conspiracy highlights

3  his diminished role and relative lack of culpability.  The Presentence Report accurately details the

4  E-Rate conspiracy as one of hub-and-spoke structure.  Judy Green was the "ringleader" throughout

5  the charged conduct.  For the great majority of that time, George Marchelos served as her principal

6  assistant.  Most of their work was done on behalf of their employer, VNCI, or ADJ Consultants,

7  Inc., a company owned by Green and her husband.  Various companies fulfilled the vendor roles,

8  including NEC-BNS.  Sohail Qasim, Chuck Ferguson, Gerard McNulty and John Colvin, all of

9  whom testified at trial, were the key participants from NEC-BNS, overseeing the day –to-day

10 operations of the E-Rate program and making key decisions.  Bill's role, and the nature of his

11 relationship with the other participants in the criminal activity, was one of an uninvolved and

12 largely absent corporate executive.

13

14

15

16



17

18

19

20

21

22

23

24

25

26

27      The relationship between NEC and VNCI was instigated by Judy Green and Sohail Qasim

28 – both of whom had previously been involved in the similar relationship between Inter-Tel and

VNCI. The initial NEC internal discussions about the project were carried out at the level of the West Regional Sales Team. Bill was not involved. When asked, Bill assisted in the negotiation and approval of the teaming agreement, but shortly thereafter he removed himself from almost all of his work responsibilities to care for his wife. He had, as the government notes, almost no interaction with Green, the acknowledged main participant in the conspiracy. (Presentence Report at ¶ 19).

Responsibility for development of the E-Rate project at NEC, including targeting schools, developing pricing and bids, and working with Judy Green and VNCI was assumed by John Colvin and Gerard McNulty. Colvin and McNulty were the main NEC employees involved in the bid rigging conspiracy. They participated, or were present, at some of the bid openings run by Green and observed her interaction with the school districts on multiple occasions. During January 2000, Colvin and McNulty assisted Green in completing the Form 471s for the school districts, including Ceria Travis. Colvin and McNulty negotiated the amount and type of end-user equipment to be included in the schools' projects and were heavily involved in the actual implementation of those projects.

Most importantly, at the time, Colvin and McNulty did not report any of these inappropriate activities to Bill. In fact, when Bill questioned whether Green's role with the school districts' bid process created a potential conflict of interest, McNulty assured Bill that Green stayed within the bounds of propriety. In contrast to Bill, who was purposefully kept in the dark, there is no doubt that Colvin and McNulty were knowing and active participants in Green's bid-rigging scheme. Consequently, it is clear that Bill is among the least culpable.

Unlike the actions of those at the heart of this scheme — Green, Marchelos, Colvin and McNulty — Bill's conduct was not significant to the success of the venture. Bill's conduct was limited to his participation in the negotiation of the teaming agreement and ultimately signing the teaming agreement — at that time he was not aware of the non-competitive agreements developed by those at the hub of this conspiracy. Thereafter, Bill's participation and ultimate criminal responsibility is perhaps better characterized as a lack of participation and proper oversight. In contrast, Green was at the heart of this scheme and critical to the success of the venture. She ran

the entire scheme from inception to discovery. She chose the vendors and the school districts, dictated the pricing and scope of the bids, ran the bidding process, wrote the application forms for the schools, dictated the school's responses to the government's follow-up requests for information, and demanded adherence to all of her requests. Within NEC, Colvin and McNulty drove the relationship with Green and VNCI and participated and capitulated in all of Green's actions.[5] Neither man informed or reported the reality of the situation to Bill – thus ensuring that the venture proceeded forward until the time when Bill returned to active involvement at work. When Bill did become aware of the issues with Green, he worked to terminate any future relationship with VNCI, thereby preventing any further success from the venture. Bill's lack of participation illustrates that he is substantially less culpable than the other participants.

Central to the success of this criminal enterprise, it is apparent that those around him deemed it was critical that Bill not become aware of the full scope and nature of the conduct of Green, Marchelos, Colvin and McNulty. As discussed, during the most significant portions of the NEC / VNCI relationship, November 1999 through February 2000, Bill's attention was focused on his wife and his family. Furthermore, in signing the teaming agreement, Bill approved what he understood to be a straightforward, legally legitimate business agreement. Green's criminal enterprise, however, incorporated inflation of the vendors' bids, command of the bidding process and prevention of an open bidding process, falsification of the schools' application forms to hide the cost of ineligible equipment and the 10% co-pay, and falsification of the schools' responses to government inquiries. NEC employees Colvin and McNulty were very well aware of most, if not all facets of Green's scheme. Their knowledge and involvement, as compared to Bill's, is clear from their extensive testimony at Green's trial. Though Bill agreed to testify, the government did not call him—he was simply not as involved nor as knowledgeable about Green's activities.

When Bill did become more aware of Green's inappropriate actions, following his return to work, he reported his concerns to both his superiors and Green's supervisors at VNCI, requesting

_____

[5]  At the time, John Colvin was in the relatively senior leadership position of Manager of Sales for Northern California. Sometime later, because of his involvement in, and ownership of, the E-Rate program, Colvin was promoted to Director of Public Sector Sales. Within these positions, Colvin enjoyed a significant level of independent authority and discretion.

that she be reigned in. When these efforts failed he ultimately pushed for the termination of the NEC / VNCI relationship.   Bill was deeply concerned with Green's influence over with the school districts and her promises to the districts that they did not have to pay the 10% co-pay.  He remained unaware of the full extent of Green's control over the bidding process and of her (and Colvin and McNulty's) active falsification of NEC's bids and the schools' Form 471 applications.

As noted above, the government emphasized in its Sentencing Memorandum that Mr. Holman's principal liability arose from his failure to notify authorities, and not from his participation in any impermissible activities.  The government's Sentencing Memorandum further underscores Mr. Holman's minimal role in the criminal conduct:

> His subordinates carried out these schemes without the normal close supervision Mr. Holman would have undertaken had he not been pre-occupied with his wife's illness.  It should also be pointed out that when he returned to active supervision, he took steps to separate NEC-BNS from the impermissible conduct still being carried on by NEC-BNS' co-conspirators for future E-Rate years.

(Government's Sentencing Memorandum at 4).

In sum, Bill's lack of knowledge of the scope of the enterprise, lack of knowledge of the extent of the others' activities and lack of active participation supports a finding of minimal participant.  He was, for the most part, a largely absent executive who did not actively participate in the central actions of the bid rigging conspiracy and who was completely unaware of the extent of the criminal enterprise.  This case presents those circumstances in which the Court is faced with a defendant who is clearly among the *least* culpable of those charged and who merits a four-level reduction in his offense level.

### 2.   The Presentence Report Erroneously Applied a Two-Level Increase Under U.S.S.G. § 3B1.1.

The Presentence Report recommends a two level increase to Bill's offense level based on the erroneous conclusion that Bill's role at NEC qualified him as an "organizer, leader, manager or supervisor" of a "criminal activity" under U.S.S.G. §3B1.1(c).[6]  Bill was not, in any way, the

---

[6]  The Presentence Report states:  "Mr. Holman took over the supervision of two employees who entered an anti-competitive agreement with VNCI.  He was an executive at NEC, had oversight of the program and became aware of Judy Green's conduct."  (Presentence Report at ¶ 31).

OHS West:260352130.3

organizer, leader, manager or supervisor of the criminal activity – the extensive conspiracy to rig

bids and commit fraud – at issue in this case.  This conclusion is in direct conflict with the Report's

own description of the offense in which Judy Green is artfully described as the "ringleader" with

George Marchelos, her "principal assistant," at the hub of a bid rigging conspiracy.  (Presentence

Report, ¶¶ 8-15.)[7]  Not only does the application of this increase fail as a result of Bill's actual

involvement, the conclusion is also legally flawed for two reasons:  first, the Report apparently

assessed Bill's role based upon the limited context of NEC's involvement in the overall criminal

enterprise rather than the enterprise as a whole; second, the Report erroneously confers §3B1.1

status on Bill by virtue of his supervisory role at NEC.  Simply stated, these conclusions are in

conflict with the black-letter law.

Section 3B1.1 explicitly requires that the conduct support the conclusion that a defendant

was an organizer, leader, manager or supervisor of *criminal activity*, not that this status can be

conferred merely by virtue of a defendant's corporate title.  For example, the Application Notes to

U.S.S.G. § 3B1.1 state that the factors a court should consider in identifying a leader or organizer

include, "the exercise of decision making authority, the nature of participation in the commission

of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the

crime, the degree of participation in planning or organizing the offense, and the degree of control

or authority exercised over others."  U.S.S.G. § 3B1.1, n.4.[8]  The Guidelines contemplate the

increase being applied to a defendant heavily involved in the criminal enterprise and actually

organizing and controlling many aspects of both the participants and the events of the criminal

activity.

In the Ninth Circuit, the relevant illegal activity over which the defendant is alleged to have

---

[7]  The Report devotes ten paragraphs covering 5 pages to the larger criminal enterprise at issue in this case.  Bill's name is mentioned only once and no facts are given supporting a conclusion that Bill was more than a minimal participant, much less had a leadership role.

[8]  Though Application Note 4, by its terms, applies only to determining whether to apply a four-level increase, courts "have found its factors relevant in determining whether a defendant is a manager or supervisor at all."  *United States v. Aptt*, 354 F.3d 1269, 1286 (10th Cir. 2004) (referencing Note 4 to assess whether defendant's involvement in a Ponzi scheme merited an increase for role in the offense).  *See also United States v. Panaro*, 266 F.3d 939, 952 (9th Cir. 2001) (referencing App. Note 4 to determine increase under § 3B1.1(c)); *United States v. Scholz*, 907 F. Supp. 329, 333 (D. Nev. 1995) (same).  In addition, the notes on the background of U.S.S.G. § 3B1.1 states, "This section provides a range of adjustments to increase the offense level based upon the size of a criminal organization . . . ***and the degree to which the defendant was responsible for committing the offense.***"  U.S.S.G. § 3B1.1, background note.

OHS West:260352130.3                                    - 12 -

1   had authority must be *the entire enterprise*. *See United States v. Scholz*, 907 F. Supp. 329, 333 (D.

2   Nev. 1995) (citations omitted) (refusing to apply leadership increase where entire enterprise

3   involved 12 people and "numerous" marijuana grow sites but defendant involvement was limited

4   to operation of only two or three grow sites). *United States v. Rose*, 20 F.3d 367, 373 (9th Cir.

5   1994) (noting that the leadership inquiry "focuses on all aspects of the relevant conduct.").

6        Courts generally apply this increase where the defendant was the clear leader in the

7   criminal activity at issue in the case. *See e.g. United States v. Cabrera*, 328 F.3d 506, 511 (9th Cir.

8   2003) (affirming district court's increase of two levels in theft of federal funds case where

9   defendant was the Secretary of Finance, initiated the fraudulent scheme, signed checks and played

10  a leading role in arranging a kickback); *United States v. Smith*, 119 F.3d 8 (9th Cir. 1997) (finding

11  defendant merited a leadership increase because he conceived of the scheme, prepared the

12  fraudulent income tax returns, received a portion of the refund, and recruited other members into

13  the scheme); *United States v. Matney*, 375 F. Supp. 2d 482 (W.D. Va. 2005) (finding bid rigging

14  defendant merited two-level increase where he was "clearly an organizer of the criminal activity in

15  question" – he had personally arranged to be the winning contractor in three bids, had supervised at

16  least two individuals "involved in the criminal activity," had paid approximately $65,500 worth of

17  bribes to government officials, and had received the most significant monetary benefit of all the

18  defendants).

19       In contrast, where the defendant may be the leader or supervisor in an organization but his

20  role in the actual offense is more peripheral, courts have refused to apply the increase. *See United

21  States v. Lewis*, 476 F.3d 369, 389 (5th Cir. 2007) (reversing district court's increase of defendant's

22  offense level because even though defendant held a leadership position in the gang associated with

23  the offense, a large methamphetamine trade conspiracy, the record showed that his involvement in

24  the trade itself was minor); *United States v. DeGiovanni*, 104 F.3d 43, 44 (3d Cir. 1997) ("[O]ne is

25  only a 'supervisor' under U.S.S.G. § 3B1.1(c) when he is so involved in, and connected to, the

26  illegal activity of others, that he actually supervises their illegal conduct, and is not just a

27  supervisor by virtue of his *de jure* position….").

28       To be sure, Bill was an executive at NEC who signed the teaming agreement and

OHS West:260352130.3

- 13 -

1   eventually, after the E-Rate program was shifted within NEC corporate structure, came to officially

2   supervise the employees involved in the E-Rate program (though he was not initially responsible

3   for the program). These acts, however, do not support an increased offense level based on a

4   leadership role *in the entire criminal activity*. As any corporate executive would, Bill supervised

5   his employees, Colvin and McNulty. Judy Green, however, organized, supervised and led both

6   the entire criminal enterprise and Colvin and McNulty within that enterprise. She was the

7   individual who directed and controlled their actions of bid rigging and fraud, including those

8   actions involving Ceria Travis. Indeed, there is ample evidence not only that Bill was unaware of

9   these anti-competitive acts, but that Colvin and McNulty took steps to hide them from Bill.

10  Moreover, when the problems were uncovered, Bill did not actively participate, but rather took

11  steps to prevent future conduct. His ultimate failure was in not cutting off the existing contracts

12  and reporting those acts to the government. Bill's mere involvement in reviewing and signing a

13  teaming agreement, the true nature of which he was not apprised, and his official position at NEC

14  do not qualify him for an increase under U.S.S.G. §3B1.1. *See DeGiovanni*, 104 F.3d at 46 (3d

15  Cir. 1997) (finding that the "mere fact that [defendant] was [the codefendants'] workplace

16  supervisor, is not enough to render him more culpable *for purposes of the conspiracy* than the other

17  'rank and file' participants.").

18              **3.     Grounds for Downward Departure From Advisory Guidelines Range**

19          There are multiple grounds justifying a downward departure to enable the Court to sentence

20  Bill to probation. Even if the Court decides that one or more of these factors does not rise to the

21  level of a Guidelines departure, it should nonetheless consider the factors (along with the others

22  discussed in Section II below) as justifications for a non-Guidelines sentences under *Gall* and 18

23  U.S.C. § 3553(a).

24              **a.     Bill Has Extraordinary Family Responsibilities.**

25          A defendant's irreplaceable role in caring for family members is a well-recognized ground

26  for a reduced sentence. *See e.g.*, *United States v. Menyweather*, 447 F.3d 625, 635 (9th Cir. 2006)

27  (affirming eight-level downward departure for extraordinary family circumstances and diminished

28  capacity and noting that departures for extraordinary family circumstances generally range

between one and four levels); *United States v. Aguirre*, 214 F.3d 1122, 1127 (9th Cir. 2000) (upholding four-level downward departure because defendant's son, who had already lost a father, would be losing his mother for a substantial period of time); *United States v. Dominguez*, 296 F.3d 192, 198-99, n.17 (3d Cir. 2002) (citations omitted) (noting that the "justification for considering family circumstances in departures is that the fundamental purposes of sentencing set forth in the Sentencing Reform Act will be fully served by a reduced sentence."); *United States v. Milikowsky*, 65 F.3d 4, 8 (2d Cir. 1995) ("Among the permissible justifications for downward departure … is the need, given the appropriate circumstances, to reduce the destructive effects that incarceration of a defendant may have on innocent third parties.").[9]

As described above, Bill's family has already undergone a horrific tragedy in Rhonda's terrible illness and death. At the time of her death, Erin and Daniel -- both under the age of 10 -- could not remember a time when their mother had not been suffering from, and struggling to beat, her cancer. Rhonda had been suffering from cancer for most of their lives. Rhonda's father, Robert W. Wise, the children's grandfather, describes that though Erin and Daniel "do not remember a time when their mother was well," they "vividly remember her death nearly 8 years ago." Letter from Robert W. Wise, Buford Decl., ¶ 2, Ex. A. Bill has been, in many ways, the primary parent for Erin and Daniel for almost all of their lives. He carried them through their mother's death and has been their only parent since then.[10]

It is almost impossible to imagine the trauma Rhonda's illness and death wrought on Erin and Daniel but it is clear, as described in the letters submitted herewith, that the main effect was to make Bill emotionally irreplaceable to his children. *See* Letter from Robert W. Wise, Buford Decl., ¶ 2, Ex. A (stating that throughout the time since their mother's death, Erin and Daniel have "depended solely on their dad for his support and strength"); Letter from John D. Sanders, Buford Decl., ¶ 3, Ex. B (noting that Rhonda's death and Bill's role as a single parent are a "most

---

[9] In *Gall*, the Supreme Court specifically noted the government's acknowledgment at oral argument that compelling family circumstances can form the basis for a probationary sentence under 3553(a). *See* discussion *infra* Sec.III (B)(2)(a).

[10] Bill has recently remarried. His wife, Shannon, should not be considered an appropriate alternative caregiver for Erin and Daniel as the marriage is very new and her role should not be perceived as parental. The children are only beginning their relationship with Shannon.

1   compelling basis to allow Bill the opportunity to carry on in the home with his important role as a

2   devoted Father in the continued growth of his children.").  Erin and Daniel are teenagers – the age

3   when life's ups and downs are felt in high definition and with high emotion.  Though the letters

4   submitted make clear that Bill has had considerable success in raising two well-adjusted young

5   adults, the incarceration of their father would be another trauma most difficult to bear.[11]

6          The circumstances of Bill's family situation are extraordinary and Bill is irreplaceable as a

7   caregiver to Erin and Daniel.  In light of the fact that Bill played a minimal role in the offense and

8   has accepted full responsibility for that role, departing based on these extraordinary family

9   circumstances enables the Court to bring about a "fair and reasonable" sentence of probation in

10  accord with the directives of *Gall* and 18 U.S.C. §3553(a).  *See Dominguez*, 296 F.3d at n.17.

11                          **b.**     **Bill's Behavior Was Aberrant.**

12         A downward departure from the advisory Guidelines is also warranted on the grounds that

13  Bill's behavior was aberrant.  *See* U.S.S.G. § 5K2.20.  Aberrant behavior is "a single criminal

14  occurrence or single criminal transaction that (1) was committed without significant planning; (2)

15  was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise

16  law-abiding life."  U.S.S.G. § 5K2.20(b).  The terms "single criminal occurrence" and "single

17  criminal transaction" are broader than a "single act."  *See* U.S.S.G. app. C, amend. 603.  The

18  advisory Guidelines definition of aberrant behavior is consistent with Ninth Circuit case law

19  predating the enactment of Section 5K2.20, in which multiple criminal acts constituted a single

20  criminal occurrence or transaction justifying a downward departure based on aberrance.  *See e.g.,*

21  *United States v. Working,* 224 F.3d 1093 (9th Cir. 2000) (en banc) (departure for aberrant behavior

22  warranted when defendant engaged innumerous separate acts culminating in an attempted murder).

23  Bill's involvement with this conspiracy was a single criminal occurrence or transaction because his

24  liability arises from his failure to report to the authorities on the questionable activities of Green

---

25  [11]  Bill has worked hard to keep the effects of this case – the investigation, charges and his plea – from interfering with
26  his children's lives.  He did not want the fear of what would happen to him to hang over their lives.  As such, they are
    only very generally aware of this case and we have not asked them to submit any letters on their father's behalf.  *See*
27  Letter from Robert W. Wise, Buford Decl., ¶ 2, Ex. A (Bill "concurred with my request and suggestion that he spare
    his young children the anxiety of his legal problems.  While we both were aware that the inevitable day would come
    when they would have to be informed, I believe that his ability to shoulder this burden and uncertainty have allowed
28  our grandchildren to grow up without the fear of losing their father as well.").

1   once he became aware of them.

2          Finally, it could not be more clear that Bill's participating in this conspiracy represents a

3   marked deviation from an otherwise law-abiding life.  Bill's conduct was a brief and deeply

4   unfortunate moment in his life that is now over 8 years behind him.  He has led an exemplary life

5   both before and since this period and has continued to earn the respect of those around him.  The

6   character references contained in the letters filed herewith establish with a profound certainty that

7   this offense is an unfortunate, once-in-a-lifetime mistake that is markedly contrary to Bill's

8   otherwise exemplary character.  *See* Letter from Robert W. Wise, Buford Decl. ¶ 2, Ex. A ("I have

9   known Bill for over 18 years and know him to be a man of character, loyalty and integrity.");

10  Letter from Reed Killets, Buford Decl., ¶ 4, Ex. C ("[Bill] practiced good judgment and was

11  respected by employees at all levels of the organization."); Letter from John D. Sanders, Buford

12  Decl., ¶ 3, Ex. B ("Bill is an ongoing credit to society with his productive contributions as a Senior

13  Management leader for his company and most importantly as a good Father and Husband."); Letter

14  from Ed Cantwell, Buford Decl., ¶ 5, Ex. D ("Despite Bill's circumstance, I do not believe society

15  would be served if Bill has to spend time away from his children and profession.")  The aberrant

16  nature of Bill's conduct supports the requested sentence of probation.

17              ### c.   **Bill's Plea Encouraged Others to Plead**

18         The Guidelines also provide that where a defendant's plea induces others to also plead, a

19  downward departure is warranted.  Such a further departure is warranted here.  Bill's agreement to

20  plead guilty not only alleviated the Court's calendar, it assisted in the administration of justice, by

21  influencing other defendants to also plead guilty thereby further clearing the Court's calendar and

22  assisting in the administration of justice.  *See United States v. Garcia*, 926 F.2d 125 (2d Cir. 1991)

23  (finding that even in the absence of a § 5K1.1 motion from the government, the court can depart

24  downward where the defendant's plea induced others to plead).  *See also United States v. Dethlefs*,

25  123 F.3d 39 (1st Cir. 1997) (noting that post-*Koon*, district court has authority to depart for

26  conduct contributing to conservation of judicial resources).

27         Based upon those facts known to date, it appears that Bill should be attributed with

28  influencing the other similarly situated defendant, Earl Nelson of Inter-Tel, to plead.

OHS West:260352130.3

- 17 -

1

2

          **d.**      **The Court Should Depart Below the Applicable Guidelines Range Pursuant to U.S.S.G. § 5K1.1, Based Upon Substantial Assistance.**

3           Because Bill has substantially assisted in the investigation or prosecution of co-defendant

4 Green, as indicated by the United States in its sentencing memorandum and motion for downward

5 departure filed on March 27, 2008, the Court should depart from the applicable Guidelines

6 sentence.  Under *United States v. Gonzalez*, 58 F.3d 459, 463, n.3 (9th Cir. 1995), "it is entirely

7 within the court's discretion to determine the extent of any departure," and this Court may consider

8 the truthfulness, completeness, usefulness, and timeliness of a defendant's assistance in doing so.

9 U.S.S.G. § 5K1.1, (backg'd).

10          Bill's plea agreement provided that he would cooperate with the government in its

11 investigation and prosecution of others.  Consistent with that agreement, Bill began cooperating

12 immediately.  As indicated by the United States in their memorandum and motion, Bill assisted

13 significantly in the government's investigation by discussing both events and documents.  He was

14 willing and prepared to testify against co-defendant Judy Green in any future proceedings, should

15 his testimony be required.  As the Court is aware, Green did, in fact, go to trial and was ultimately

16 convicted.  The United States ultimately did not seek testimony from Bill.[12]  Bill provided

17 consistently "truthful, candid and complete" and timely information, both regarding his role in the

18 conspiracy and the roles of the other defendants.  (Government's Sentencing Memorandum at 4).

19          Based on the foregoing, Bill submits, along with the government, that he has provided

20 substantial assistance to the government within the meaning of § 5K1.1.  Accordingly, the Court

21 should depart below the applicable Guidelines range, in order to recognize the value of Bill's

22 cooperation and encourage others to cooperate with the government.

23           **e.**      **A Combination of the Factors Above Justify the Requested Departure.**

24

25          The Sentencing Guidelines envision that, in some cases, a combination of factors will

26 justify a downward departure.  *See* U.S.S.G. § 5K2.0 ("The Commission does not foreclose the

27

28

---

[12] That Bill's testimony was not required at Green's trial illustrates the fact that Bill's participation in and knowledge of the details of the conspiracy were minimal.  Colvin and McNulty each testified extensively against Green.

possibility of an extraordinary case that, because of a combination of …characteristics or circumstances, differs significantly from the 'heartland' cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case."). The Ninth Circuit has long held that a "combination of factors" can together constitute a mitigating circumstance justifying a departure. *See United States v. Cook*, 938 F.2d 149, 153 (9th Cir. 1991) ("There is no reason to be so literal-minded as to hold that a combination of factors cannot together constitute a 'mitigating circumstance.'"). *See also United States v. Lam*, 20 F.3d 999, 1003-1005 (9th Cir. 1994) ("[A] number of convergent factors" supported the conclusion that the defendant's conduct was aberrant).

The factors elaborated above – Bill's extraordinary family history and responsibilities, the aberrant nature of his conduct, his assistance in administration of justice, and his minimal role in the offense – each individually and in the aggregate warrant a departure to the requested sentence of probation.

**B.      ADDITIONAL FACTORS UNDER SECTION 3553(A) SUPPORT A SENTENCE OF PROBATION.**

In addition to considering the advisory Guidelines and the applicable departures discussed above, the Court must take into consideration the other factors listed in § 3553(a) in determining the most appropriate and reasonable sentence under the circumstances.[13]   *See Gall*, 128 S. Ct. at 596-97 (stating that after determining the advisory Guidelines range, the district court may not presume the Guidelines range to be reasonable but must consider all the § 3553(a) factors to determine whether they support the sentence requested by the party). *See also Zavala*, 443 F.3d at

---

[13]   Section 3553 (a) lists seven factors for the Court to consider. The first factor requires the Court to consider the "nature and circumstances of the offense and history and characteristics of the defendant." 18 U.S.C. §3553(a)(1). The second factor requires the Court to consider the general purposes of sentencing, including "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553 (a) (2). The third factor requires the Court to consider the kinds of sentences available; the fourth requires the Court to consider the range suggested by the advisory Guidelines. 18 U.S.C. § 3553 (a) (3-4). The fifth factor requires the Court to consider any relevant policy statements issued by the Sentencing Commission. 18 U.S.C. § 3553 (a)(5). The sixth factor requires the Court to be mindful of the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553 (a)(6). The seventh factor requires the Court to consider the need to provide restitution to any victim. 18 U.S.C. § 3553 (a)(7).

1170.  The overriding motivation and basic mandate of § 3553(a) requires this Court to impose a

sentence "sufficient *but not greater than necessary*," to comply with the principles of sentencing.

A sentence of probation is unquestionably sufficient but not greater than necessary.

Probation, as the Supreme Court has recently confirmed, is a "substantial restriction of freedom."

*Gall*, 128 S.Ct. at 595 (citations omitted) (noting that probationers do not "enjoy the absolute

liberty to which every citizen is entitled" and that probationers are subject to restrictions and

regulations of their physical movement, they are required to report regularly to their probation

officer and allow unannounced visits to their homes among other restrictions). On an

"individualized assessment" of all of the factors relevant to this case and this defendant, it is clear

that probation is the appropriate sentence.

### 1.   The Nature and Circumstances of the Offense Support the Requested Sentence.

Bid rigging is a serious offense and one that, in the "heartland" of cases, merits a sentence

involving incarceration.  This is not such a case.  As discussed above and in the Presentence

Report, Bill's role was minimal and marked by his lack of knowledge of the scope of the

enterprise.  As indicated in the Plea Agreement, Bill's liability arises from his failure to report

Green once he became aware of the problems with her activities.  Bill was not involved in, and

unaware, of the facts constituting the majority of the crimes committed by the members of this

conspiracy, i.e. the creation of the bids, Green's running the bid-openings and choosing vendors,

and the inflation and falsification of the Form 471s.  Bill's earlier questions regarding the nature of

Green's role with the school districts were assuaged by Colvin and McNulty, the NEC employees

directly involved in the criminal enterprise.  When Bill did become aware of problems with Green,

he reported this to his superiors at NEC and stopped NEC from committing to future involvement

with VNCI and Green.  That Bill was only peripherally involved in the enterprise is clear from the

fact that he was not called to testify at Green's trial.

In addition, Bill has fully accepted responsibility for his actions and his failure to report

Green and VNCI to the government.  He has cooperated with the government's investigation and

agreed to testify at trial and sentencing if needed.  As such, the circumstances surrounding Bill's

1    involvement in the offense amply support the requested sentence of probation.

2          **2.      The History and Characteristics of the Defendant Support the Requested**
             **Sentence.**
3
                  **a.      Bill Plays a Vital Role in the Lives of His Two Teenage Children.**
4

5          In *Gall*, the Supreme Court reviewed the district court's analysis of various factors

6    supporting its imposition of a sentence of probation, noting that the Guidelines are only one of the

7    factors to consider when imposing sentence.  Importantly, the Court also noted the government's

8    acknowledgment at oral argument "that probation could be an appropriate sentence, given the exact

9    same offense, if 'there are compelling family circumstances where individuals will be very badly

10   hurt in the defendant's family if no one is available to take care of them'").  *Gall,* 128 S. Ct. at 602.

11         We have discussed Bill's family and its history at length, but the importance of Bill's role in

12   his family cannot be overstated.  Bill comes before this Court as a person, a father and a

13   businessman, who made a serious mistake in judgment which he deeply regrets.  We have

14   explained the factors – personal and professional, and ultimately terribly human – contributing to

15   that mistake.  For the Court to fully understand and articulate why a sentence of probation is a

16   reasonable and fair sentence under 18 U.S.C. § 3553 (a), Bill's role as the only parent of Erin and

17   Daniel is of utmost importance.

18         At the beginning of this memorandum, we stated that Bill is, first and foremost, a man

19   devoted to his family.  For Bill, devotion means his life is guided by a desire to keep and protect

20   his family, and particularly his children from harm.  It means he works with singular purpose to

21   become successful to provide his children with a comfortable childhood.  It means that when faced

22   with more than his fair share of tragedy and difficulty, Bill has simply squared his shoulders and

23   placed one foot in front of the other, always with the goal of remaining strong and stable for his

24   children.  It means that Bill has always attempted to carry all things facing his family, all burdens

25   and all tasks, upon his own back.

26         Over the course of Rhonda's illness, Bill tried every possible approach to find a treatment

27   or a cure.  He moved the family to Grand Junction, Colorado so that Rhonda could be near her

28   brother.  Bill continued his work with NEC, now effectively telecommuting from Colorado.  After

OHS West:260352130.3                                - 21 -

1   the tumor was found on Rhonda's spine and she entered the hospital, Bill either slept in her hospital

2   room or at home with Erin and Daniel (alternating with the children's grandparents) for four

3   months.  Though he cut back on work during this time, as we have discussed, he still attempted to

4   keep up with his responsibilities.  He very rarely mentioned, much less discussed, his personal

5   situation with his work associates, preferring to maintain his professionalism and keep his privacy

6   and that of his wife and children.

7          Since Rhonda's death, Bill has worked hard to bring his children into the normalcy of a

8   happy childhood.  Through his continued hard work at Inner Wireless he is able to provide for

9   them materially.  He works hard at making time to spend with the children and being involved in

10   their lives.  *See* Letter from Shannon Holman, Buford Decl., ¶ 6, Ex. E:

11          An example of how Bill prioritizes his time and responsibilities is how Bill has managed to

12   attend Daniel's afternoon football games.  Even though Bill works one hour away he was able to

13   attend each game despite the early afternoon start times.  Bill also recently took on the task of

14   teaching Erin to drive.  This is a stressful task for any adult and Bill always took it in stride and

15   enjoyed each adventure.  He is a proud father and his children are proud of him.

16          Most importantly, he makes sure that Erin and Daniel can rely upon him and feel secure in

17   the knowledge of their father's presence, pride and love.

18          With the development of this investigation, Bill has again shouldered as much of the

19   burden of the anxiety and fear as he can.  He has worked hard to maintain Erin and Daniel's

20   innocence of the situation facing their father.  Bill has deep concerns over their reaction should he

21   have to undergo incarceration.  In addition, while he immediately informed his current employer

22   Inner Wireless of the situation, he has steadfastly worked to prevent this matter from affecting his

23   performance at work.  All of this highlights the vital character of this man who has faced

24   difficulties in life that no one would wish to face and who has committed himself to protecting his

25   family and ensuring that they grow up as strong and happy as possible.  A sentence of probation

26   ensures that Erin and Daniel do not lose their only remaining parent and ensures that Bill can

27   remain the strong force he is for these children.  *See* Letter from William Holman, Buford Decl., ¶

28   7, Ex. F.

OHS West:260352130.3

- 22 -

**b.   Bill Has No Criminal History and Will Not Engage in Future Criminal Conduct.**

A defendant's criminal history and the low probability that he will recidivate provide justification for awarding a reduced sentence. *See e.g.*, *United States v. Ward*, 814 F. Supp. 23, 24 (E.D. Va. 1993) (departure warranted because the Guidelines fail to consider the length of time the defendant refrained from commission of first crime, here until age 43); *United States v. Luciana*, 379 F. Supp. 2d 288, 297 (E.D.N.Y. 2005) ("Post-*Booker* courts have noted that recidivism is markedly lower for older defendants.").

That Bill will not engage in future criminal conduct is amply supported by the record, the Presentence Report and studies of recidivism.  Bill is now in his fifties, stably employed, well-educated, married, has two young children and one adult child, has no prior convictions, and has continued to contribute to society for the nearly 9 years since these events.  Recent studies by the United States Sentencing Commission indicate that such individuals are, compared to others, less likely to recidivate.  *See* United States Sentencing Commission, *Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines*, Release 1 (2004) at 12, *available at* http://www.ussc.gov/research.htm (finding that older defendants with stable employment before the offense, higher education,  and who are married without criminal records are less likely to recidivate).

Further, Bill's sincere remorse for his actions is additional evidence that he will not commit another crime.  Bill is not an emotionally expressive man and he has worked hard at maintaining his life, and his children's lives, at a normal level throughout this matter.  That does not mean, however, that Bill does not feel a deep and quiet remorse for his involvement in this matter.  In his letter to the Court, Robert Wise, one of the very few people with whom Bill has shared his devastation at this matter, states:

> Bill has sought my counsel and support over the past few years as he has dealt with his ongoing legal issues.  He has shared with me his great remorse for his conduct and acknowledged his poor judgment and lack of management oversight.  Bill has never offered any excuses for his conduct, never complained about his circumstances or blamed others for his actions.  Throughout, I have marveled at his strength and ability to simultaneously handle these great pressures.

1    Buford Decl., ¶ 2, Ex. A.

2            Because Bill presents no risk or future criminal conduct, a sentence of probation is

3    appropriate.

4            **3.    The Public Will Benefit From the Requested Sentence.**

5            Taking account of Bill's history, his current position both professionally and personally,

6    and what he has to offer society, the public will be better served by granting Bill a sentence that

7    would enable him to contribute to society rather than spending time in prison.  Bill has a leadership

8    position at Inner Wireless and is a valued member of their executive team.  Both the company as a

9    whole and Bill's immediate employees would suffer unnecessarily should be incarcerated.  *See*

10   Letter from Ed Cantwell, Buford Decl., ¶ 5, Ex. D ("Losing Bill would be a great blow to the

11   company and to our customer base.");  Letter from John D. Sanders, Buford Decl., ¶ 3, Ex. B ("It is

12   my sincere hope that Bill will be allowed to carry on in his current position as his leadership is

13   greatly valued by those reporting to Bill and his Executive Management associates.").  As we have

14   described, Bill's family will benefit greatly from his presence.  Furthermore, Bill proposes to spend

15   as much of his sentence as the Court deems appropriate engaged in community service.  U.S.S.G.

16   § 5F1.3 ("Community service may be ordered as a condition of probation or supervised release.")

17   **C.    FINE**

18           The Presentence Report indicates that the advisory fine range is $4,000 to $350,000.[14]  Our

19   primary goal in this memorandum has been to demonstrate to the Court that a sentence of

20   probation is the reasonable and appropriate sentence in this case because it is of paramount

21   importance that Bill remain a physical and active presence in his children's lives.  We acknowledge

22   that Bill's financial resources outlined in the Presentence Report certainly enable him to pay a fine.

23   We note, however, that in imposing a fine the Court must consider the eight factors listed in

24   U.S.S.G. § 5E1.2(d).[15]  On consideration of those factors, the Court should find that the amount of

---

[14]  This range assumes an offense level of 15.  As we have argued throughout this memorandum, we believe this offense level to be erroneous.  Assuming an offense level of 8, the advisory fine range is $1,000 to $350,000.

[15]  The eight factors the Court must consider are:  (1) the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence; (2) any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources; (3) the burden that the fine places on the defendant and his dependents relative to alternative punishments; (4) any

OHS West:260352130.3                                - 24 -

1   the fine should tend toward the lower end of the range outlined in the Presentence Report.

2          A sentence of probation and a fine at the low end of the range amply deter and afford

3   punishment and accurately reflect the seriousness of Bill's offense.  Bill has never before been

4   brought before this court or any other and ordered to pay a fine.  Furthermore, based upon his

5   conduct in nearly nine years since the offense, there is no basis to believe he will ever come before

6   any other court in like matters.  If granted probation, the costs to the government will be minimal.

7   Further, a fine toward the lower end of the spectrum will alleviate the burden to his family,

8   particularly in light of his children's impending attendance at college.

9                                   **IV.  CONCLUSION**

10         For all of the reasons elaborated above, a sentence of probation is "sufficient, but not

11  greater than necessary" to accomplish the purposes of sentencing.  18 U.S.C. § 3553 (a).  Bill asks

12  the Court to allow him to serve his sentence while caring for his family and continuing in his

13  professional capacity.

14  Dated: March 31, 2008                    Respectfully submitted,

15                                           ORRICK, HERRINGTON & SUTCLIFFE LLP

16

17                                           By:_____/s/_____Walter F. Brown, Jr._
18                                                 Walter F. Brown, Jr.
                                                   Attorneys for Defendant
19                                                 WILLIAM HOLMAN

20

21

22

23

24

25

26

27  restitution or reparation that the defendant has made or is obligated to make; (5) any collateral consequences of
    conviction, including civil obligations arising from defendant's conduct; (6) whether the defendant previously has been
28  fined for a similar offense; (7) the expected costs to the government of any term of probation, or term of imprisonment
    and term of supervised release imposed; and (8) any other pertinent equitable considerations.  U.S.S.G. §5E1.2 (d).
    OHS West:260352130.3                          - 25 -